**Arron Joshua CASTILLO, Appellant**

v.

**The STATE of Texas, Appellee**

**No. 11–14–00280–CR**

Court of Appeals of Texas, Eastland.

Opinion filed April 13, 2017

Christian T. Souza, Law Office of Christian T. Souza, Dallas, TX, for appellant.

Laura Nodolf, District Attorney, Eric Kalenak, Assistant, District Attorney's Office, Midland, TX, for appellee.

Panel consists of: Wright, C.J., Willson, J., and Bailey, J.

## OPINION

### JOHN M. BAILEY, JUSTICE

The jury convicted Arron Joshua Castillo of murder and assessed his punishment at confinement for fifty years in the Institutional Division of the Texas Department of Criminal Justice. Appellant challenges his conviction in five issues on appeal. Appellant's first three issues concern the manner in which the trial court instructed the jury about the accomplice witness rule as it pertained to Deseare Carroll.[1] *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). In his fourth issue, Appellant contends that the non-accomplice evidence was insufficient to connect Appellant to the offense. In his fifth issue, Appellant asserts that the trial court abused its discretion in admitting hearsay evidence. We affirm.

### *Background Facts*

Kyara West, the victim in this case, was the mother of Appellant's two young children, T.W. and I.W. In July 2013, Appellant was living in Lubbock with his girlfriend, Sandy Carroll.[2] West was living in Midland with T.W. and I.W. On the evening of July 9, Appellant, Sandy, and Appellant's two other children arrived in Midland because Appellant had a child support hearing on the morning of July 10 concerning his financial support of T.W. and I.W. Appellant and West attended the hearing at 8:30 a.m. At the hearing, the trial court ordered Appellant to pay monthly child support and awarded Appellant visitation rights.

Appellant took T.W. and I.W. with him from the hearing to his parents' home in Midland but later returned I.W. to West because he was fussy. That night, at 11:00 p.m., West walked from her apartment to a nearby convenience store. Cell phone records indicated that she received a call from a restricted number at 11:04 p.m. At 11:09 p.m., West placed a phone call to her mother and told her that she was on her way to meet Appellant because Appellant was going to give her some money. At 11:51 p.m., West received a second call from a restricted number.

At 11:30 p.m., Carmen and Thomas Ezell Jr. returned home to the Midland Village Apartments. Carmen could not park in her usual spot because it was occupied by a tan or beige Tahoe that was backed into the parking space. The Ezells saw what appeared to be two Black males sitting in the vehicle. Thomas testified that the driver had a slender build and that the passenger had a heavy build. After fifteen to twenty minutes, the Ezells heard what Carmen believed to be two gunshots. The Ezells saw a third Black male walk toward the Tahoe from the direction in which the Ezells heard the noise.

Thomas described the third individual as being approximately six feet tall with a heavy build and frizzy hair. He wore a shirt with diagonal stripes. He had his hand on his leg and appeared to be holding something in his pocket. The third individual got into the backseat of the Tahoe. The Tahoe began to drive away but stopped at the corner. The third individual exited the vehicle, walked back to where he came from, leaned against a tree, looked around, and then returned to the vehicle and reentered it. The Tahoe then drove away. Once the Tahoe was gone, the Ezells walked outside to go check on an elderly neighbor. Shortly after midnight on July 11, the Ezells found West's body in a field next to

---

1. We will refer to Deseare Carroll as "Carroll."

2. We will refer to Sandy Carroll as "Sandy." Deseare Carroll and Sandy Carroll are not related.

the apartments, whereupon they called 9–1–1.

Carroll testified that, at around 10:00 p.m. on July 10, she and her girlfriend went to Appellant's parents' house [3] to visit Appellant. After approximately thirty minutes, Carroll and Appellant used Carroll's orange Avalanche to drive Carroll's girlfriend home. They then picked up Appellant's friend, Carlos Martinez. Martinez had a gun that was wrapped in a white T-shirt that he brought with him.

After picking up Martinez, Appellant asked Carroll to drive to a convenience store. When they arrived, Appellant asked Carroll for money. Appellant gave Carroll's money to Martinez and instructed him to "go get it." Martinez entered the convenience store and returned a short time later with a receipt for the purchase of prepaid phone minutes. Appellant loaded the minutes onto a blue phone. Carroll had never seen Appellant use this phone before because Appellant usually used an iPhone. Carroll, Martinez, and Appellant then returned to Appellant's house.

At approximately 11:00 p.m., Appellant asked Carroll to give him a ride to West's apartment. Appellant told Carroll that he wanted to give West some money for their children. Carroll did not want to take her vehicle, so Appellant offered his grandmother's SUV, which Carroll believed to be a Yukon. Carroll drove the SUV, with Appellant and Martinez riding along. Appellant was not sure exactly where West lived, so he instructed Carroll to park at the Midland Village Apartments. Carroll backed into a parking spot at the apartment complex.

The three of them got out of the vehicle and began to walk around and look for West. They could not find her, so they returned to the SUV. Appellant called West, using the blue phone, and asked her to come meet him. At this time, Appellant was wearing black Jordan tennis shoes, a colorful tank top that had a puzzle-piece design, and black shorts.

While still on the phone, Appellant left to go meet West. Carroll and Martinez followed Appellant until he located West. Carroll and Martinez then returned to the SUV. Carroll waited in the driver's seat, and Martinez waited in the front passenger seat. After approximately thirty minutes, Carroll heard a gunshot, a pause, then four more gunshots.

Carroll panicked and began to drive away, but Martinez told her not to leave yet. Carroll described Martinez's reaction as "calm." Appellant returned to the SUV, got into the backseat, and threw the gun down. Appellant then exclaimed, "F--k, I dropped that phone." Carroll told him to go back and get it. Appellant left to go look for the phone.

Carroll again began to drive away. Again, Martinez told her to wait. She parked in a different parking spot and waited for an additional five minutes. When Appellant did not reappear, Carroll left without him. Martinez instructed Carroll to drive to his apartment so that he could drop off the gun. The pair then returned to Appellant's house, where they found Appellant sitting on the porch with Sandy. Appellant was no longer wearing a shirt. Carroll testified that Appellant confessed to Carroll and Martinez that he shot West once, began to walk away, but then returned and shot her four more times.

---

**3.** Appellant lived in Lubbock, but he was staying at his parents' house in Midland at the time of the murder. The witnesses at trial all referred to the house in Midland as "Appellant's house," so we will do the same.

Martinez asked Carroll for a ride home. Before they left, Appellant gave Carroll his Jordan shoes and the blue prepaid phone and asked her to get rid of them. Martinez directed Carroll to a dumpster and attempted to rip the shoes. Carroll placed the shoes and the phone in the dumpster and covered them with a piece of sheetrock. She then took Martinez home and returned to her girlfriend's apartment at 1:30 a.m.

The following morning, Carroll turned herself in to the police. She later pleaded guilty to tampering with evidence in connection with the murder. Carroll denied any knowledge of Appellant's plans to murder West when she drove Appellant to the area of West's apartment complex.

Martinez testified that, at around 10:00 or 10:30 p.m. on July 10, Carroll and Appellant picked him up at his apartment in an orange Avalanche. Appellant asked Martinez to bring his revolver. The three of them drove to Appellant's house and changed vehicles, getting into a green SUV. They then drove to the convenience store, where Martinez purchased the prepaid phone minutes. From there, they went to an apartment complex to meet West. Appellant contacted West and told her that he wanted to give her some money. Martinez testified that he waited in the SUV with Carroll while Appellant met with West. After forty to sixty minutes, Martinez heard a gunshot, followed by a pause, and then heard two or three more gunshots.

Martinez testified that Carroll began to panic and that, in response, he told her to wait for Appellant. Appellant jumped into the backseat of the SUV, but then got out to go look for his phone. Carroll parked in a different parking spot and waited an additional three or four minutes before eventually giving up and returning to Appellant's house. At Appellant's house, Appellant confessed to Martinez that he had shot West as she was walking away from him.

Appellant asked Martinez to get rid of the gun. He asked Carroll to get rid of "the other stuff." Carroll then gave Martinez a ride home, but they took a detour to get rid of the gun and the other evidence. Martinez testified that, when Appellant committed the murder, Appellant was wearing an orange and blue muscle shirt with tiger stripes and solid-colored shorts. Martinez was wearing a pair of baby blue Jordan tennis shoes. Martinez later pleaded guilty to first-degree murder and tampering with evidence in connection with West's murder.

Detective Charles Sims of the Midland Police Department investigated the murder. He testified that West had gunshot wounds to her head and chest. After a detective spoke with West's family, Detective Sims brought Appellant to the police department. The police drove the Ezells to Appellant's house, where a tan Tahoe was parked. The Ezells could not identify the Tahoe as the same one they had seen earlier that night. However, they acknowledged that it was the same make, model, and color. The police also asked the Ezells to identify Appellant as the individual they saw returning to the vehicle after hearing the gunshots. Appellant's hair was different because it appeared wet and flat, unlike the frizzy hair on the individual they had seen earlier that night. The Ezells told police that they could not be sure that Appellant was the same man that they had seen outside their apartment. However, they acknowledged that Appellant was the same "skin color," height, and build as the individual they had seen.

Detective Sims questioned Martinez. Martinez took the police to the revolver. Detective Sims observed that the revolver

had six shells in the cylinder and that four of them had been fired.

Detective Sims searched Appellant's phone and found two pictures of Appellant wearing a colorful tank top with diagonal stripes. Carroll identified that shirt as the one Appellant was wearing on the night of the murder. Carroll took police to the dumpster containing the shoes and the prepaid phone.

Police found two sets of shoeprints in the vicinity of West's body. The first set appeared to match the shoes Martinez wore on the night of the murder. The second set appeared to match the shoes that Carroll placed in the dumpster. This second set of shoeprints also appeared to match shoeprints found outside Appellant's house.

Police examined the cell phones belonging to Appellant and West. Police could not examine the prepaid phone because it was broken. Text messages between Sandy and Appellant, exchanged between 10:22 p.m. and 12:58 p.m., indicate that Sandy believed that Appellant was not at home during this time frame. Information obtained from West's phone revealed two phone calls from a "restricted" phone number at 11:04 p.m. and 11:51 p.m. and an outgoing call to her mother at 11:09 p.m.

Text messages between Appellant and West in the months leading up to the murder indicated that Appellant wanted West to dismiss the child support litigation. Text messages between Appellant and his aunt in the days and weeks leading up to the murder indicated that Appellant and Sandy were struggling financially and relied on family members to help them pay their bills and buy food.

Appellant's defense was that he was home during the time of the murder. Sandy testified that Appellant was happy with the results of the child support hearing. According to Sandy, the children went to bed at 8:30 p.m. At 9:15 p.m., Carroll arrived at Appellant's house with her girlfriend. Sandy went to bed at around 9:30 p.m. but remained awake. Appellant's mother saw Appellant in the kitchen with Carroll at around 10:00 p.m. At 10:22 p.m., Sandy sent a text message to Appellant, asking where he was. Appellant sent a reply at 10:24 p.m., stating that he was in the bathroom. Sandy saw Appellant in the hallway talking to his mother and sister around 11:30 p.m. Appellant's mother saw him watching television at around 11:50 p.m. Around 12:30 a.m., Sandy texted Carroll and asked her to send Appellant to bed. Carroll did not respond. Appellant sent Sandy a text message at 12:52 a.m., saying that he could not sleep and that he was in the living room watching Duck Dynasty. Sandy got out of bed and joined him. The two went to bed a few minutes later.

Appellant testified on his own behalf during the guilt/innocence phase. He testified that he was happy about the outcome of the child support hearing. On the night of July 10, he was at home watching a Duck Dynasty marathon that aired from 6:30 p.m. until 2:30 a.m. Martinez visited Appellant at around 9:15 p.m. and stayed for about twenty minutes. Carroll and her girlfriend visited Appellant at around 10:00 p.m. and stayed until about 10:45 p.m. Appellant's sister arrived home at around 11:00 p.m. Sometime later, Appellant saw his mother in the kitchen. At around 12:45 a.m., Appellant called Carroll and Martinez because he was bored. Appellant confirmed that the colorful shirt with diagonal stripes pictured in the photos on his phone belonged to him. Appellant also confirmed that the shoes found in the dumpster belong to him.

In its charge to the jury, the trial court instructed the jury regarding the accom-

plice witness rule. The trial court instructed the jury that Martinez was an accomplice witness as a matter of law. The trial court treated Carroll as an accomplice witness as a matter of fact and instructed the jury to determine whether Carroll was an accomplice witness in order to determine if the accomplice witness rule should be applied to her testimony.

### Analysis

■ Ordinarily, we would begin our analysis with issues addressing a challenge to the sufficiency of the evidence, which in this case would be Appellant's fourth issue. However, we must initially address Appellant's first issue, concerning whether Carroll was an accomplice as a matter of law, because the resolution of that issue will determine if we must consider Carroll's trial testimony as either accomplice testimony or non-accomplice testimony in conducting our sufficiency review. *See* 43A George E. Dix et al., *Texas Practice Series: Criminal Practice and Procedure* § 51:96 (3d ed. 2011) (explaining that, if the jury is properly instructed to determine whether or not a witness is an accomplice witness, our review of the evidence does not involve an inquiry into the sufficiency of the evidence to corroborate the testimony of that witness); *id.* § 51:105 (same); *see also Worthen v. State*, 59 S.W.3d 817, 821 (Tex. App.–Austin 2001, no pet.) (where witness's status was properly submitted to jury, court of appeals on review would assume jury found that witness was not accomplice; thus, testimony of that witness was sufficient to corroborate testimony of another witness who was an accomplice as a matter of law).

■ In Appellant's first issue, he asserts that the trial court erred by treating Carroll as an accomplice as a matter of fact, when it should have treated Carroll as an accomplice as a matter of law. Texas statutorily requires that, for a conviction to be based on an accomplice witness's testimony, that testimony must be corroborated by independent evidence tending to connect the accused with the crime. CRIM. PROC. art. 38.14. A person is an accomplice if she participates with a defendant in the commission of a crime by doing some affirmative act, with the requisite mental state, that promotes the commission of that offense. *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006); *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). A witness can be either an accomplice as a matter of law or an accomplice as a matter of fact. *Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013); *Cocke*, 201 S.W.3d at 747.

■ For accomplice witnesses as a matter of law, the trial court must instruct the jury that the witness is an accomplice and that her testimony must be corroborated. *Zamora*, 411 S.W.3d at 510. A witness is an accomplice as a matter of law if either (1) she has been charged with the same offense as the defendant or a lesser included offense or (2) the evidence is undisputed or otherwise clearly shows that she could have been convicted of the same offense or a lesser included offense. *Id.*; *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007); *Cocke*, 201 S.W.3d at 747–48; *Arney v. State*, 580 S.W.2d 836, 839 (Tex. Crim. App. [Panel Op.] 1979). A witness must be considered an accomplice as a matter of law if "there exists no doubt or the evidence clearly shows" that the witness could be convicted of the crime. *Gonzales v. State*, 441 S.W.2d 539, 541 (Tex. Crim. App. 1969).

■ On the other hand, if there is conflicting or inconclusive evidence that a witness was complicit in the crime, then the witness is an accomplice as a matter of fact. *Zamora*, 411 S.W.3d at 510. When the witness is an accomplice as a matter of

fact, the trial court must instruct the jury (1) to decide whether the witness is an accomplice and, if so, (2) to apply the corroboration requirement. *Id.* As the Court of Criminal Appeals noted in *Arney*:

> When there is a question as to whether a witness is an accomplice, it is proper to submit that issue to the jury, and this is sufficient *even though the evidence appears largely to preponderate in favor of the witness being an accomplice.* It is only when the evidence clearly shows that the witness is an accomplice witness as a matter of law that the trial court has a duty to so instruct the jury.

*Arney*, 580 S.W.2d at 839 (emphasis added) (citations omitted).

Appellant argues that Carroll is an accomplice witness as a matter of law for two reasons. First, she aided or assisted Appellant in the murder by acting as his getaway driver, taking Appellant to the convenience store to purchase the prepaid minutes, giving Appellant money to purchase the prepaid phone minutes, and walking around the apartment complex looking for West. Second, her actions indicate that she was aware of Appellant's plans to murder West because she refused to drive her own vehicle and because she backed into the parking space with, according to Appellant, the purpose of making a quick getaway. Appellant relies on *Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985) (evidence that the defendant drove the getaway vehicle was sufficient to support a robbery conviction as a party to the offense), and *Webber v. State*, 757 S.W.2d 51, 56 (Tex. App.–Houston [14th Dist.] 1988, pet. ref'd) (same). Appellant further cites and distinguishes *Moore v. State*, 984 S.W.2d 783, 788 (Tex. App.–Waco 1999, no pet.) (driver was not considered an accomplice witness as a matter of law because there was no evidence

that she had the "requisite intent to commit" the offense).

We agree with Appellant that in some cases, such as *Thompson* and *Webber*, defendant *could* be convicted of an offense as a party if she acts as a getaway driver. *See* TEX. PENAL CODE ANN. § 7.02 (West 2011). However, in both of those cases, the issue before the reviewing court was whether or not the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt the essential elements of the offense. *Thompson*, 697 S.W.2d at 416 (applying the standard in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Webber*, 757 S.W.2d at 55 (same). Here, we are not concerned with whether the jury *could* have found that Carroll was an accomplice witness. Rather, we are concerned with whether the evidence was so strong that any rational jury *must* have found that Carroll was an accomplice witness. *See Zamora*, 411 S.W.3d at 510; *Druery*, 225 S.W.3d at 499; *Cocke*, 201 S.W.3d at 747–48; *Arney*, 580 S.W.2d at 839; *Gonzales*, 441 S.W.2d at 541.

For example, in *Moore*, the defendant was convicted of robbery. *Moore*, 984 S.W.2d at 785. A witness testified that she was asked by the defendant to drive him to a friend's house. *Id.* The witness testified that she was intoxicated and denied having any knowledge, either before or during the commission of the robbery, of the defendant's intentions. *Id.* at 785–86. The Waco Court of Appeals concluded that the defendant was not entitled to an instruction that the witness was an accomplice as a matter of law because there was no evidence that the witness had the "requisite intent to commit robbery." *Id.* at 788.

Appellant distinguishes *Moore* by pointing out that, unlike in *Moore*, there is ample evidence that Carroll had the requisite mental state. Carroll refused to drive

her own vehicle, was aware that Martinez brought a gun with him, and backed into the parking space at the Midland Village Apartments for the purported purpose of making it easier to escape the area quickly. We agree with Appellant that this evidence might be sufficient for a jury to conclude that Carroll was an accomplice. However, we do not believe that it is clear and undisputed that Carroll was an accomplice.

Like in *Moore*, Carroll testified that she had no knowledge of Appellant's true intentions. She stated that she did not want to drive her Avalanche to West's apartment because Appellant always asked her to drive and never contributed gas money. We conclude that, because the evidence was disputed as to whether or not Carroll had the intent to commit murder, the trial court did not err in submitting an "accomplice as a matter of fact" instruction to the jury with respect to Carroll. *See Marlo v. State*, 720 S.W.2d 496 (Tex. Crim. App. 1986) (citing *Arney* and holding that when a witness implicates himself as being involved in a murder and the disposal of a body, but denies that he had any prior knowledge that the murder would be committed, the witness cannot be an accomplice as a matter of law). We overrule Appellant's first issue.

We will next address Appellant's second and third issues because they concern the manner in which the trial court instructed the jury about Carroll's status as an accomplice as a matter of fact. In Appellant's second issue, he asserts that the trial court erred in failing to instruct the jury to apply the accomplice witness rule if a witness "directed" the defendant. "Regardless of whether it identifies an accomplice as a matter of law or as a matter of fact, the jury instructions must also explain the definition of an accomplice." *Zamora*, 411 S.W.3d at 510. As noted by the Court of Criminal Appeals in *Zamora*, Article 38.14 does not define the term "accomplice." *Id.* Courts have described an accomplice as someone who, under the evidence, could have been charged with the same or a lesser included offense. *Id.*

The court held in *Zamora* that "an accomplice-witness instruction is required when the evidence raises the question of whether a witness is an accomplice under a party-conspirator theory" under Section 7.02 of the Texas Penal Code. *Id.* at 512. Under Section 7.02, a person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." PENAL § 7.02(a)(2). However, "the particular instruction that must be given depends on the circumstances of each case." *Zamora*, 411 S.W.3d at 510. A defendant is only entitled to a jury instruction if the evidence raises an issue with regard to that instruction. *See Kunkle v. State*, 771 S.W.2d 435, 443–44 (Tex. Crim. App. 1986).

In this case, the jury was instructed that an accomplice is someone who, "acting with the intent to promote or assist the commission of the offense, . . . encourages, aids or attempts to aid the other person to commit the offense." Appellant argues that this definition is incomplete because it omits from the instruction the word "directs" as set out in Section 7.02(a)(2). *See* PENAL § 7.02(a)(2). According to Appellant, the evidence at trial showed that Carroll "directed" Appellant when she told him to go back and retrieve the blue prepaid phone. Therefore, Appellant contends that he was entitled to have the jury instructed that Carroll was an accomplice witness if she "directed" Appellant. We disagree.

When a witness provides assistance to the defendant after the defendant commits a crime, the witness is not an accomplice. *Easter v. State*, 536 S.W.2d 223, 228–29 (Tex. Crim. App. 1976) (discussing Section 7.02 and the associated Practice Commentaries). The 1974 Penal Code eliminated all previous references to "accessories." *Id.* at 228. Therefore, an "accessory after the fact" is no longer subject to indictment for the same offense committed by the principal. *Id.* at 229. Instead, assisting a principal after he commits a crime constitutes the separate offense of hindering apprehension or prosecution. *Id.; see also* PENAL § 38.05. Therefore, a witness who assisted the defendant only *after* the defendant committed the crime with which he is charged cannot be an accomplice witness because the witness cannot be charged with the same offense as the defendant. *Easter*, 536 S.W.2d at 228–29; *Worthen*, 59 S.W.3d at 820.

Carroll testified that, *after* she heard the gunshots, she knew that Appellant had killed West. After Carroll had this realization, she initially panicked, but then she assisted Appellant by waiting for him in the SUV, telling him to retrieve the prepaid phone, and disposing of evidence. While Appellant is correct that Carroll "directed" Appellant to retrieve the phone within the ordinary meaning of that term, she did not do so until after Appellant killed West. Therefore, even if the jury believed this portion of Carroll's story, it is not evidence that Carroll was an accomplice witness.

We have found no evidence that Carroll "directed" Appellant before or during the commission of the murder. Therefore, Appellant was not entitled to a jury instruction that included the term "directed" in the definition of accomplice. We overrule Appellant's second issue.

In his third issue, Appellant asserts that the trial court erred in failing to instruct the jury to apply the accomplice witness rule if the witness participated before, during, or after the commission of the offense. The term "accomplice" has frequently been defined to mean a person who participated "before, during, or after" the commission of the offense with the requisite mental state. *See, e.g., Zamora*, 411 S.W.3d at 510; *Cocke*, 201 S.W.3d at 748; *Paredes*, 129 S.W.3d at 536; *McFarland v. State*, 928 S.W.2d 482, 514 (Tex. Crim. App. 1996); *Kunkle*, 771 S.W.2d at 439. However, none of the above-cited cases hold that "before, during, or after" must be included in the jury instructions. In *Zamora*, the Court of Criminal Appeals acknowledged that "the particular instruction that must be given depends on the circumstances of each case" and that "appellate courts have frequently tailored the definition of an accomplice to the facts of particular cases." *Zamora*, 411 S.W.3d at 510.

As previously noted, "after the fact" assistance does not make a person an accomplice. *See Easter*, 536 S.W.2d at 228–29. Accordingly, the trial court did not err in omitting the word "after" from the accomplice witness instruction. Appellant also contends that the omission of the word "before" precluded the jury from considering Carroll's conduct before the murder in determining whether she was an accomplice. We disagree. The trial court instructed the jury that Carroll could be an accomplice and explained that a person is an accomplice if, "acting with the intent to promote or assist the commission of the offense, the person encourages, aids or attempts to aid the other person to commit the offense." This definition did not preclude the jury from considering Carroll's conduct prior to the murder. We overrule Appellant's third issue.

In his fourth issue, Appellant asserts that the evidence was insufficient to connect him to the offense under the accomplice witness rule. In order to support a conviction based upon the testimony of an accomplice, there must be corroborating evidence that tends to connect the accused with the offense. Crim. Proc. art. 38.14; *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). In reviewing the sufficiency of the corroborating evidence, we eliminate the accomplice testimony from consideration and focus on the remaining portions of the record to determine whether there is any evidence that tends to connect the defendant with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999). The corroborating evidence may be direct or circumstantial and need not be sufficient by itself to establish the defendant's guilt; it is sufficient if the combined weight of the non-accomplice evidence tends to connect the defendant to the offense. *Solomon*, 49 S.W.3d at 361; *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991). Such corroboration may come from small details. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999). We review the corroborating evidence in the light most favorable to the verdict. *Taylor v. State*, 328 S.W.3d 574, 578 (Tex. App.–Eastland 2010, pet. ref'd). Once corroborated, testimony of an accomplice may be considered by the jury in the same manner as any other competent evidence. *See Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

In this case, there were two potential accomplice witnesses: Carroll and Martinez. Martinez is an accomplice as a matter of law because he was indicted and pleaded guilty to the same offense as Appellant, and the jury was instructed accordingly. *See Zamora*, 411 S.W.3d at 510; *Druery*, 225 S.W.3d at 499. With respect to Carroll, we have determined that she was not an accomplice as a matter of law and that the jury was properly instructed to determine whether she was an accomplice. When the jury is properly instructed to determine whether the witness is an accomplice and the jury then convicts the defendant, we treat this on review as an implied finding that the witness was not an accomplice. Dix et al., § 51:96 (citing *Thompson v. State*, 537 S.W.2d 732, 734 (Tex. Crim. App. 1976)). Since we have held that Carroll is not an accomplice as a matter of law and have determined that the jury was properly instructed about her potential status as an accomplice as a matter of fact, we assume that the jury found that she was not an accomplice when it convicted Appellant of murder. *See Thompson*, 537 S.W.2d at 734; *Worthen*, 59 S.W.3d at 821. Accordingly, Carroll's testimony can be considered as evidence corroborating Martinez's testimony. Therefore, there was ample non-accomplice evidence to connect Appellant to the offense.

Moreover, even if we were to consider Carroll to be an accomplice, there is still sufficient corroborating evidence to connect Appellant to the offense. First, the Ezells witnessed three individuals in a tan or beige Tahoe. While the Ezells could not positively identify Appellant as the man they saw outside their apartment on July 10, they confirmed that Appellant appeared to be the same "skin color," height, and build. They also described the third individual they saw as wearing a colorful striped T-shirt. This T-shirt matched the description of a T-shirt that Appellant acknowledged belonged to him. Similarly, while the Ezells could not say with certainty that Appellant's Tahoe was the vehicle they saw parked in Carmen Ezell's parking spot, they confirmed that it was the same make, model, and color. While a de-

fendant's mere presence at the scene of the crime is, by itself, insufficient corroboration, the defendant's presence combined with other suspicious circumstances may be sufficient to connect the defendant to the crime. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992). Likewise, evidence that the defendant was in the presence of an accomplice at or near the time or place of the crime is proper corroborating evidence. *McDuff v. State*, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997).

Second, Appellant acknowledged that the shoes found in the dumpster belonged to him. These shoes appeared to match shoeprints found near West's body and outside Appellant's house in Midland. Third, at 11:09 p.m., West made a phone call to her mother. During that call, West told her mother that she was on her way to meet with Appellant so that he could give her money.[4] This call occurred shortly after West received a phone call at 11:04 p.m. from a restricted phone number. A prepaid phone was later found with Appellant's shoes in the dumpster.[5]

 Additionally, there was evidence that Appellant had the motive and opportunity to commit the murder. Appellant lived in Lubbock. However, he was in Mid-

land for a child support hearing that occurred earlier on the day of West's murder. Appellant was obligated to pay West monthly child support as a result of the hearing. There is evidence that Appellant was struggling financially and may not have been able to make those payments. While evidence of motive or opportunity is insufficient alone to corroborate an accomplice witness, it may "be considered in connection with other evidence tending to connect the accused with the crime." *Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App. 1998). We overrule Appellant's fourth issue.

 In Appellant's fifth issue, he asserts that the trial court erred in admitting hearsay statements regarding West's plans to meet with Appellant on the night of her murder. We review a trial court's ruling on admissibility of evidence for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). We will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001). We will uphold an evidentiary ruling on appeal if it is correct on any theory of law that finds support in the record. *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006); *Dering v.*

---

4. In his fifth issue, Appellant challenges the trial court's admission of the details of the phone call from West to her mother. Even if this evidence was improperly admitted, it is still considered in our review of the sufficiency of corroborating evidence. *Medrano v. State*, 421 S.W.3d 869, 882–83 (Tex. App.–Dallas 2014, pet. ref'd) (citing *Clayton*, 235 S.W.3d at 778; *Munoz v. State*, 853 S.W.2d 558, 560 (Tex. Crim. App. 1993)) (explaining that all evidence, whether properly or improperly admitted, is considered in a challenge to the sufficiency of the evidence to corroborate the testimony of an accomplice is a challenge to the sufficiency of the evidence to support the verdict on guilt).

5. Appellant asserts that the prepaid phone cannot be considered because the police discovered it only as a result of Carroll informing the police about its location and, therefore, that it constitutes accomplice evidence. As noted previously, we assume that the jury found that Carroll was not an accomplice. Furthermore, Appellant cites no authority in support of the proposition that the accomplice witness rule precludes the consideration of physical evidence that an accomplice leads the police to discover prior to trial. In the absence of authority for this proposition, we decline to extend the accomplice witness rule to this extent.

*State*, 465 S.W.3d 668, 670–71 (Tex. App.–Eastland 2015, no pet.).

Information obtained from the victim's phone indicated that she received a phone call from a restricted number at 11:04 p.m. Five minutes later, at 11:09 p.m., the victim placed a call to her mother, Trudy West. Trudy testified that, during the 11:09 p.m. phone call, "[West] told [Trudy] that she was going to meet [Appellant] because he was going to bring her some money." Appellant objected to the statement on hearsay grounds. The State argued that this statement falls under the "present sense impression" exception to the hearsay rule. The trial court overruled Appellant's hearsay objection and allowed the statement into evidence.[6]

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. Tex. R. Evid. 801(d). A statement is a present sense impression and falls under the exception to the rule against hearsay if it "describ[es] or explain[s] an event or condition, made *while or immediately after* the declarant perceived it." Tex. R. Evid. 803(1) (emphasis added). The rationale for this exception stems from the statement's contemporaneity, not its spontaneity. *Rabbani v. State*, 847 S.W.2d 555, 560 (Tex. Crim. App. 1992). If the declarant had time to reflect upon the event or the conditions he observed, the event or conditions are not contemporaneous. *Fischer v. State*, 252 S.W.3d 375, 381 (Tex. Crim. App. 2008).

Appellant focuses his complaint on the five-minute lapse of time between the 11:04 p.m. phone call that West received

from a restricted number and the 11:09 p.m. phone call that West made to her mother. We agree with the State that, in this case, the five-minute lapse of time between the two phone calls does not destroy the contemporaneity of West's statement to Trudy.

There is no bright-line rule as to when a lapse of time becomes too long for a statement to be considered "immediately after" the declarant perceived the event. *See Kubin v. State*, 868 S.W.2d 394, 396 (Tex. App.–Houston [1st Dist.] 1993, pet. ref'd). For example, the Fifth Circuit has held that a fifteen-minute lapse of time is too long. *U.S. v. Cain*, 587 F.2d 678, 681 (5th Cir. 1979). On the other hand, the Fourteenth Court of Appeals has found that a thirty-minute lapse of time is not too long. *Harris v. State*, 736 S.W.2d 166, 167 (Tex. App.–Houston [14th Dist.], no pet.). The Court of Criminal Appeals has explained that in order to fall under the present-sense-impression exception, the statement must have been made "before any thoughts of litigation have crystallized" and "without any reflection, thought process, or motive to fabricate or exaggerate." *Fischer*, 252 S.W.3d at 379.

We conclude that Trudy's statement that "[West] told [Trudy] that she was going to meet [Appellant] because he was going to bring her some money" constituted a present sense impression. The declarant described to Trudy an event as it was happening. Appellant also asserts that West's statement, as relayed through Trudy, cannot fall under the present-sense-impression exception because "there was grave danger of insincerity." Appellant ar-

---

6. Trudy's description of the phone call was also alluded to during the testimony of Detective Sims when he testified that he "received information [from Trudy] that Kyara had received a phone call from [Appellant] wanting to meet her to give her some money." Appel-

lant objected to this statement on hearsay grounds. The trial court overruled the objection on the basis that it was "admitted for the limited purpose to show why the officer proceeded with the investigation, not for the truth of the matter stated."

gues that he "would not have wanted to see the deceased." He further argues that Trudy had a motive to lie to Detective Sims in order to implicate Appellant, whom she believed to be her daughter's killer. Whether Appellant wanted to see West and whether Trudy had a motive to lie are factors that bear on Appellant's and Trudy's sincerity, respectively. At issue is whether or not *the declarant* had enough time to reflect on the event or any motive to fabricate or exaggerate. Here, there is no evidence that West had any motivation to lie to her mother about whom she spoke to on the phone or about the contents of the phone call. Therefore, it was not an abuse of discretion for the trial court to admit the statement as a present sense impression of West. We overrule Appellant's fifth issue.

### *This Court's Ruling*

We affirm the judgment of the trial court.