**Opinion filed May 16, 2024**



## In The

# Eleventh Court of Appeals

_____

## No. 11-22-00139-CR

_____

## JOEL ANDRES MELENDEZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 50th District Court**
**Knox County, Texas**
**Trial Court Cause No. 4156**

## M E M O R A N D U M   O P I N I O N

Appellant, Joel Andres Melendez, was charged by indictment with the second-degree felony offenses of aggravated assault with a deadly weapon and conspiracy to commit murder.[1]  *See* TEX. PENAL CODE ANN. §§ 22.02(b), 15.02(d),

---

[1]Appellant was originally charged by two indictments—one for the aggravated-assault offense, and one for the conspiracy-to-commit-murder offense.  The State subsequently filed a notice of consolidation

19.02(c) (West Supp. 2023). The jury found Appellant guilty of both offenses and assessed Appellant's punishment at confinement for twenty years in the Institutional Division of the Texas Department of Criminal Justice for each offense. The jury also assessed a fine of $10,000 for each offense. The trial court ordered Appellant's sentences to run concurrently.

In two issues, Appellant challenges his conviction for conspiracy to commit murder.[2] In his first issue, he challenges the sufficiency of the evidence to support his conviction by asserting that the State failed to sufficiently corroborate accomplice witness testimony as required by Article 38.14 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2023). In his second issue, Appellant asserts that the trial court erred by denying his motion for directed verdict on the same basis.[3] We affirm.

*Background Facts*

Marcus Lee Kimmel, the victim in this case, and Kristy Jo Rivera were in a relationship for ten years. Both Rivera and Kimmel described their relationship as "very toxic." Rivera testified that Kimmel was "very abusive." Kimmel testified that both he and Rivera would yell at each other, and that Rivera had physically assaulted him; Kimmel denied ever hitting Rivera. Conversely, Rivera said that Kimmel physically beat her, had previously shot a firearm in her direction, and had once "[dragged her] across the yard" by her arm to keep her from leaving their home.

---

pursuant to Section 3.02(b) of the Texas Penal Code. *See* PENAL § 3.02(b) (West 2021). The cases were consolidated into a single criminal action, with the aggravated-assault charge as Count One and the conspiracy-to-commit-murder charge as Count Two, and the charges were tried together.

[2]Appellant does not challenge his conviction for aggravated assault with a deadly weapon.

[3]Appellant moved for a directed verdict only on the charge for conspiracy to commit murder.

Rivera also testified that Kimmel would keep their child from her in an attempt to "manipulate" her and "make [the] family get back together."

Rivera said Kimmel continuously stalked her, harassed her, and broke into her home, forcing her to obtain a "no harassment" order and "no trespassing" order against him. Rivera knew that Kimmel had firearms and that he "always carries." Rivera moved in with her parents, but Kimmel would "sit[] outside" her parents' house. Kimmel told Rivera that "he was going to make every day of [her] life a living hell." Rivera summarized the last few years of her relationship with Kimmel as "really bad," and testified that she began wanting someone to kill Kimmel for her.

Rivera began an "informal . . . dating relationship" with Appellant in April 2021. Rivera testified that she asked Appellant to kill Kimmel. Rivera said she had "vented" to a mutual friend about wanting to "get[] rid" of Kimmel, and Rivera assumed the mutual friend had told Appellant what she said. Rivera and Appellant then spoke about Appellant shooting Kimmel. Rivera explained that the discussion was "just small talk here and there . . . there was really no plan," but she thought that Appellant "believed that [she] meant it."

On the evening of June 28, 2021, Kimmel messaged Rivera and asked her if she knew anyone that he could buy hydrocodone from. Rivera told Kimmel that he could buy hydrocodone from "Miguel," a person she knew from high school. Kimmel had not met "Miguel" before. "Miguel," however, was actually Appellant.

Kimmel testified that he was originally supposed to meet "Miguel" in Hamlin, but he left after "Miguel" did not show up. Kimmel said he then went to meet "Miguel" in Rule, but he failed to show up again. Kimmel drove home. Kimmel testified that Rivera was home with him at this time, and he believes that Rivera "laced" his beer with methamphetamine. Kimmel later tested positive for

3

methamphetamine while he was being treated in the hospital. Rivera denied lacing Kimmel's beer with methamphetamine.

At around 11:00 p.m., Kimmel received a text from "Miguel" asking Kimmel if he was "still needing those things." After Kimmel replied in the affirmative, "Miguel" told him that he could meet him at "the beer store" in Goree. Kimmel drove to the liquor store, waited, and started driving home after "Miguel" did not show up for a third time.

Kimmel received a phone call from "Miguel" soon after he began driving home. "Miguel" asked Kimmel if he was driving a black Jeep Grand Cherokee. Kimmel confirmed, and "Miguel" told him, "Well, I just missed you . . . I'm dropping my kids off at my family's house. You can turn around and I'll meet you." Kimmel turned around and began driving back toward the liquor store.

Kimmel testified that he was approaching a stop sign when "somebody stepped out with a gun, a pistol pointed at me, and started unloading rounds." Kimmel was shot once above the right ear, once in the back of the head, and once in the leg. Kimmel drove away for "about a quarter of a mile" before crashing the vehicle. Kimmel testified that he called Rivera and asked her to pick him up, but she did not. Kimmel said he managed to walk home and subsequently was taken to the hospital in an ambulance.

Kimmel recognized the shooter as Appellant just before he was shot. Appellant had messaged Kimmel on Facebook a "couple days" earlier and asked him whether he was "running [his] mouth about [Appellant] driving [Kimmel's] car." Appellant had offered to "smoke it out," which Kimmel understood to be a threat of gun violence. Kimmel testified that he did not know Appellant and that he "didn't even know what [Appellant] was talking about because [he] didn't know

4

any[one] was driving the car but [Rivera]." Kimmel testified that Appellant's connection to Rivera "dawned on [him]" while he was at the hospital.

Most of Rivera's testimony about the night of the shooting matched Kimmel's testimony. Rivera testified that she told Appellant that Kimmel was coming home from work. Rivera testified that she and Appellant planned to "get [Kimmel] alone" so that Appellant could kill him. Rivera testified that she and Appellant planned for Appellant to meet Kimmel in Hamlin so that the murder would be "out of town." Rivera was the one to tell Kimmel to go to Hamlin to meet "Miguel."

Rivera testified that Appellant did not meet Kimmel in Hamlin because Appellant was in Abilene at the time. At this point, Rivera "kept calling" Appellant while she was at work because Appellant had her car. Rivera told Appellant that Kimmel was on his way home from Hamlin and that Kimmel would stop by Rivera's work and notice that her car was missing.

Rivera said Appellant did not return her car until 10:30 p.m., and that she and Appellant got into a fight as she dropped him off at his mother's house. Appellant texted Rivera after she dropped him off and told her that "he was going to get this over with because he hated [her] . . . that he wanted to shoot [Kimmel] and get paid." Rivera testified that she told Appellant to "[d]eal with this on your own" and gave him Kimmel's number so that Appellant could text him directly. Rivera received a call from Kimmel later that night, telling her that he had been shot. In contrast to Kimmel's testimony that he walked home after being shot, Rivera testified that she picked him up "on Main Street in Goree" to take him to the hospital. After Kimmel "started screaming at [her] and punching the dash," Rivera told Kimmel that "he could take himself to the hospital."

Rivera testified that Appellant also called her after he shot Kimmel to tell her that Kimmel was still alive. Rivera met with Appellant after Kimmel was taken to the hospital. Rivera recalled being in "shock" because she only thought Appellant was going to "beat [Kimmel] up." Rivera testified that she was honest when she was interviewed the night of the shooting and admitted to her involvement. Rivera confirmed that she was charged with conspiracy to commit murder for her role in Kimmel's shooting and that she had made a deal with the State to testify at Appellant's trial in exchange for a five-year prison sentence.

Texas Ranger Job Espinoza testified that the Knox County Sheriff's Office contacted him regarding the shooting. Ranger Espinoza spoke to Rivera. After speaking with Rivera, Ranger Espinoza determined that Rivera and Appellant were the primary suspects in the investigation. Ranger Espinoza also seized Rivera's cell phone, which showed calls between Rivera and Kimmel and between Rivera and Appellant before and after the shooting.

Knox County Sheriff Hunter West Embesi testified that he searched the residence where Appellant was arrested. Sheriff Embesi found a backpack containing a firearm, bullets, Rivera's identification card, and various credit cards belonging to Kimmel in the ceiling above the kitchen. Appellant's mother later informed Sheriff Embesi that another firearm was in a trash can in the residence, which Sheriff Embesi recovered. The caliber of the second recovered firearm matched the caliber of the firearm Appellant used to shoot Kimmel.

*Analysis*

In his first issue, Appellant asserts that there was insufficient evidence that Appellant and Rivera conspired to murder Kimmel. We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim.

6

App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* CRIM. PROC. art. 38.04 (West 1979); *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly proves the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514, S.W.3d 227, 232 (Tex. Crim. App. 2017).

The State charged Appellant with conspiracy to commit murder. A person commits criminal conspiracy if, with the intent that a felony be committed, (1) he agrees with a person that they or one of them engage in conduct that would constitute the offense; and (2) he or one of them performs an overt act in pursuance of the agreement. PENAL § 15.02(a). The State alleged that Appellant, with the intent that murder be committed, agreed with Rivera that one of them would engage in conduct that would constitute murder, and that Appellant performed an overt act in pursuance of the agreement by shooting Kimmel on or about the head. There is no dispute that Appellant performed the overt act of shooting Kimmel. In that regard, Appellant does not contest his conviction for aggravated assault with a deadly weapon. Therefore, we focus our inquiry on whether the State sufficiently proved that Appellant and Rivera had an agreement that Appellant would shoot Kimmel with the intention of murdering him. Appellant contends that the only evidence that Appellant engaged in a conspiracy to murder Kimmel is Rivera's testimony. *See* CRIM. PROC. art. 38.14.

When, as in this case, the jury's verdict could have been based on the testimony of an accomplice, the sufficiency review must incorporate the accomplice witness rule stated in Article 38.14. *Id.* In order to support a conviction based upon the testimony of an accomplice, there must be corroborating evidence that tends to connect the accused with the offense. *Id.*; *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). In reviewing the sufficiency of the corroborating evidence, we eliminate the accomplice witness testimony from consideration and focus on the remaining portions of the record to determine whether there is any evidence that tends to connect the defendant with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Cathey v. State*, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999). The corroborating evidence may be direct or

8

circumstantial and need not be sufficient by itself to establish the defendant's guilt; it is sufficient if the combined weight of the non-accomplice evidence tends to connect the defendant to the offense. *Solomon*, 49 S.W.3d at 361; *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991). Such corroboration may come from small details. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999).

We review the corroborating evidence in the light most favorable to the verdict. *Taylor v. State*, 328 S.W.3d 574, 578 (Tex. App.—Eastland 2010, pet. ref'd). Once corroborated, testimony of an accomplice may be considered by the jury in the same manner as any other competent evidence. *See Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

We briefly address Appellant's contention that the only evidence supporting Rivera's testimony was Appellant's motive to murder Kimmel, and that "[m]otive to assault—or murder—is not sufficient proof of conspiracy." Appellant asserts that his motive to murder Kimmel was to "protect Kristy Rivera and her children." However, Appellant contends that "[w]anting a person dead is not proof of engaging in a conspiracy to accomplish it. As the facts demonstrate no conspiracy was necessary to achieve that end." Appellant cites no authority in support of his proposition that a person cannot be convicted of criminal conspiracy if he had an independent motive to commit the crime.

Appellant's contention that motive cannot "to any modicum" constitute evidence of conspiracy is incorrect. "While evidence of motive or opportunity is insufficient *alone* to corroborate an accomplice witness, it may 'be considered in connection with other evidence tending to connect the accused to the crime.'" *Castillo v. State*, 517 S.W.3d 363, 377 (Tex. App.—Eastland 2017, pet. ref'd) (emphasis added) (quoting *Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App.

1998)).    Accordingly, we may consider Appellant's motive in our analysis so long as there was additional evidence that corroborated Rivera's testimony.

Here, there was sufficient evidence to corroborate accomplice witness testimony.  The State specifically points to the admission of Rivera's cell phone records and the backpack found in the residence where Appellant was arrested that contained a firearm, Rivera's identification card, and Kimmel's credit cards.

Rivera testified that Appellant called her after the shooting to tell her that Kimmel was still alive, and Kimmel called her after the shooting to tell her that he had been shot.  Rivera's cell phone records show multiple calls between Rivera and Appellant and between Rivera and Kimmel around the time of the shooting.  While Rivera did not testify about the backpack Sheriff Embesi recovered, the jury could have rationally inferred from Appellant's possession of—and concealment of—Kimmel's credit cards and Rivera's identification card that Appellant agreed with Rivera that he would commit murder, especially considering that the firearm with which Appellant was presumed to have shot Kimmel was recovered at the same location.

Further, the text message exchange between Kimmel and Appellant corroborates Rivera's testimony.  Kimmel testified that he had asked Rivera if she knew someone that he could buy hydrocodone from, and that she told him he could buy from "Miguel."  Kimmel testified that he had never met "Miguel."  Thus, someone would have needed to give Kimmel's phone number to Appellant so that he could contact Kimmel directly, and Rivera testified that she initially set up the meeting between Kimmel and "Miguel."  Kimmel testified, and the text messages reflect, that "Miguel" had texted him for the first time *after* the initial plan to meet to ask if he was "still needing those things."

In summary, the jury could have rationally inferred and found that Appellant's motive, Rivera's cell phone records, the backpack, and Appellant's text messages with Kimmel all tended to connect Appellant to a conspiracy, with Rivera, to murder Kimmel. *See Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011) ("The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense."); *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) ("Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration."). Therefore, Rivera's accomplice witness testimony was sufficiently corroborated, and we may consider it in conducting our review of the sufficiency of the evidence.

Appellant asserts that Rivera's testimony is not sufficient to "make out" a conspiracy because she "acknowledged on cross examination that there was no conspiracy." In support, Appellant references Rivera's testimony that her conversations with Appellant regarding her desire to have Kimmel murdered were "just small talk here and there. It wasn't -- there was really no plan except for the time that I talked to [the State] about." Appellant defines the "plan" Rivera was referring to as his text to Rivera stating that he wanted to "get this over with" and "get paid." Essentially, Appellant asserts that his conversations with Rivera were merely opportunities for Rivera to "confide in others her feelings" about Kimmel, and that Rivera's testimony that there "was really no plan" is an acknowledgement that no agreement between Appellant and Rivera existed.

Appellant mischaracterizes Rivera's testimony. Although Rivera testified that her initial conversations with Appellant about murdering Kimmel were "just small talk" that did not amount to a "plan," Rivera also testified that she told Appellant that night that Kimmel was on his way home, and that she and Appellant agreed that

11

they would "get [Kimmel] alone that day" so that Appellant could murder him. Moreover, even if Rivera's testimony was inconsistent about whether she and Appellant agreed that Appellant would murder Kimmel that night, the jury was the sole judge of the credibility of the witnesses and of the weight to be given their testimony. *See* CRIM. PROC. art. 36.13, 38.04; *Brooks*, 323 S.W.3d at 899. As such, the jury was entitled to accept or reject any or all testimony of any witness. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *Ibarra v. State*, 479 S.W.3d 481, 488 (Tex. App.—Eastland 2015, pet. ref'd). Thus, the jury could have chosen to believe Rivera's testimony about her plan with Appellant on the night of the shooting.

Rivera's testimony, along with other corroborating evidence presented at trial, sufficiently established a conspiracy to commit murder between Rivera and Appellant. Moreover, the jury was entitled to draw reasonable inferences from the evidence. *See Jackson*, 443 U.S. at 319. Therefore, the jury could have determined that Rivera's testimony was supported by Kimmel's testimony, Rivera's cell phone records, texts between Appellant and Kimmel, and the backpack Sheriff Embesi recovered. Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have inferred and found beyond a reasonable doubt that Appellant conspired with Rivera to commit the murder of Kimmel. We overrule Appellant's first issue.

In Appellant's second issue, he asserts that he was harmed by the trial court's denial of his motion for directed verdict because it allowed "a prosecution in which the evidence was insufficient to support a conviction . . . to go forward." Appellant essentially contends that the trial court erred in denying his motion for directed verdict because there was insufficient evidence to allow the jury to convict him of conspiracy to commit murder. The denial of a motion for directed verdict is treated

as a challenge to the sufficiency of the evidence before the trial court, and we apply the same sufficiency review set forth in *Jackson*. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996); *see Jackson*, 443 U.S. at 319. Having already concluded that there was sufficient evidence to support the jury's verdict, we further conclude that the trial court did not err in denying Appellant's motion for directed verdict. Because the trial court did not err in its denial of Appellant's motion for directed verdict, we do not address Appellant's harm contention. *See* TEX. R. APP. P. 47.1. Appellant's second issue is overruled.

*This Court's Ruling*

We affirm the judgments of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


May 16, 2024

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.